UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THOMAS STALCUP,

       Plaintiff,

v.                                    No. 13-cv-11967-LTS

DEPARTMENT OF DEFENSE AGENCY,

       Defendant.

## REPORT AND RECOMMENDATION ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT

CABELL, U.S.M.J.

## I.    INTRODUCTION

On July 17, 1996, TWA Flight 800 exploded and crashed shortly after takeoff from New York's John F. Kennedy International Airport.  In 2010, plaintiff Thomas Stalcup, suspicious that the incident might have been the result of an errant missile fired by the U.S. Navy, requested information from the Department of Defense Agency ("DoD") through the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  Unsatisfied with a response that no responsive records existed, Stalcup brought this *pro se* action in 2013 to compel the government to produce the requested records.  Over the next several years, Stalcup, through litigation as well as through

cooperation with the government, collected information from various governmental and non-governmental entities.

The government contends it has satisfied (and indeed gone beyond) its FOIA obligations and moves for summary judgment. (D. 260). Stalcup disagrees and cross-moves for summary judgment on the ground that the government's efforts have still fallen short. (D. 255). For the reasons discussed below, I conclude that the government has met its obligations with respect to two portions of the plaintiff's FOIA request but has not met its burden with respect a third. I thus recommend that both motions be <u>allowed</u> in part and <u>denied</u> in part.

## II.  LEGAL FRAMEWORK

The principal issue before a court facing summary judgment motions in the FOIA context is whether the agency has shown that it has 'made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'" *Oleskey ex rel. Boumediene v. U.S. Dep't of Def.*, 658 F. Supp. 2d 288, 294 (D. Mass. 2009) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). This showing may be made by affidavits, "provided they are relatively detailed and nonconclusory, and are submitted by responsible agency officials in good faith." *Maynard v. C.I.A.*, 986 F.2d 547, 559 (1st Cir. 1993). An adequate affidavit will "describe in reasonable detail the scope and method by which the

search was conducted" and "describe at least generally the structure of the agency's file system which makes further search difficult." *Id.* at 559 (quotations omitted). The affidavits, further, may "set[] forth the search terms and the type of search performed, and aver[] that all files likely to contain responsive materials . . . were searched." *Oleskey*, 658 F. Supp. 2d at 294 (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 313-314 (D.C. Cir. 2003)). If the agency makes a sufficient showing, "a rebuttable presumption that the agency acted in good faith emerges." *Stalcup v. C.I.A.*, 768 F.3d 65, 74 (1st Cir. 2014).

A requester can rebut that presumption and avoid summary judgment only "by showing that the agency's search was not made in good faith." *Maynard*, 986 F.2d at 560. If the agency does not supply sufficient evidentiary support for its search, then the requester may avoid summary judgment "merely by showing that the agency might have discovered a responsive document had the agency conducted a reasonable search." *Id.* It is important to note, however, that in assessing the adequacy of a search, "[t]he crucial issue is not whether relevant documents might exist, but whether the agency's search was 'reasonably calculated to discover the requested documents.'" *Id.* at 559 (quoting *Safecard Servs., Inc. v. S.E.C.*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)).

## III.  RELEVANT BACKGROUND

### A.    The Original FOIA Requests

On March 28, 2010, Stalcup submitted a records request to the Office of the Secretary of Defense ("OSD") and the Joint Staff ("JS") seeking information regarding:

> the names and dates of all Naval, Joint, Defense Program, and/or contractor exercises, operations, and/or tests conducted on the East Coast of the United States in June, July, and August 1996; 2) any and all follow-up reports, observer reviews, and Joint Universal Lessons Learned Reports from all such exercises, operations, and/or tests that included intercept and/or target missiles or drones off the East Coast of the United States between May 1996 and October 1996; and 3) all memos, reports, emails, or other communications related to the downing of a commercial aircraft (simulated or otherwise) during any such event listed above.

(D. 1-1).

Stalcup on the same day sent a request to the Missile Defense Agency ("MDA") seeking:

> all Test and Evaluation Master Plan's [sic] for all systems involved in Missile Defense for FY1996; 2) All information regarding Live Fire Test and Evaluation exercises that included intercept and/or target missiles off the East Coast of the United States between May 1996 and October 1996; 3) any and all Joint Universal Lessons Learned Reports from all exercises that included intercept and/or target missiles off the East Coast of the United States between May 1996 and October 1996; and 4) all memos, reports, emails, or other communications related to the downing of a commercial aircraft (simulated or otherwise) during any exercise conducted in 1996 or 1997.

(D. 1-2).

Then, on February 15, 2011, Stalcup submitted another request to the OSD and JS seeking:

> any and all submissions to the Office of the Secretary of Defense regarding the "analysis of, and conclusions regarding, the conduct and results" of any test or exercise conducted from June 1, 1996 to October 30, 1996 on or off the East Coast of the United States involving the launching of one or more missiles. This request includes, but is not limited to all submissions to the Office of the Secretary of Defense as required by subsection (c)(2) of section 237 of the National Defense Authorization Act for Fiscal Year 1994.

(D. 1-3).

### B.   <u>Procedural Posture</u>

On August 15, 2013, Stalcup filed this FOIA complaint against the DoD after receiving what he deemed to be an unsatisfactory response to his requests.  (D. 1).

The parties in time filed cross-motions for summary judgment. (D. 27, 32).  While those motions were pending, the government requested a stay of the case to permit a further search for responsive documents. (D. 39).  The court allowed that stay, and the further search led to renewed motions for summary judgment. (D. 40).

The court granted partial summary judgment in the government's favor with respect to the MDA request but took the motion under advisement with respect to the OSD/JS requests pending the submission of additional information. (D. 57).  Upon submission

of that additional information, the court entered summary judgment in favor of the United States.  (D. 72).

Stalcup appealed and the First Circuit reversed the court's entry of judgment after concluding that the record failed to establish that the DoD satisfied its "burden of proving that it conducted a reasonably thorough search." (D. 79).  On February 26, 2018, the court accordingly ordered the government to file supplemental affidavits addressing the deficiencies identified by the First Circuit.  (D. 80).

On May 31, 2018, the government moved again for summary judgment. (D. 95).  On October 15, 2018, the court denied the government's motion after finding that it still had failed to make the showing required by the First Circuit.  The court provided the government another (last) opportunity to submit further supplemental affidavits and move anew for summary judgment. (D. 110).  The court indicated it would allow Stalcup to conduct discovery, something he had been seeking permission to do since the beginning of the lawsuit, if it denied summary judgment. (Id., D. 56, 64 101).

On November 19, 2018, the government moved to stay the case for 30 days on the ground that it had discovered an additional repository with seven boxes of documents, not previously identified or searched, that could contain responsive documents.

(D. 116).  Two days later, though, the government moved anew for summary judgment.  (D. 119).

The court denied the government's motion.  The court found among other things that summary judgment was premature in light of the disclosure of the additional unsearched boxes.  Consistent with its earlier admonition, the court authorized limited discovery to take place over the approximate next three and a half months.  For various reasons, however, that three and a half months period ultimately spanned some 20 months.[1]  (D. 121).

**C.  <u>The Present Motions</u>**

On June 8, 2020, the government moved once again for summary judgment.  (D. 208).  On August 3, 2020, the plaintiff opposed. (D. 218).  The court held argument on September 17, 2020.  (D. 238).  Among other things, the government argued that it had met its burden of showing that it had made a good faith effort to search for the requested records.  In opposition, the plaintiff

---

[1] A sense of the activity and the parties' dynamic during this period is perhaps reflected in a July 23, 2020 court order addressing a then pending discovery-related motion:  "Almost two years ago, on November 21, 2018, the court authorized the plaintiff to engage in limited discovery principally to determine whether the Department of Defense (DoD) had conducted a reasonably thorough search for information responsive to the plaintiff's FOIA request. (D. 121).  As the parties are well aware, though, the scope of the discovery the plaintiff has requested and sometimes obtained has been much broader at times, and has included several subpoenas to non-DoD entities for depositions and non-DoD documents, seemingly with the at least co-incidental goal of furthering the plaintiff's underlying factual investigation.  Generally speaking, the government has not always endorsed these requests but it has on several occasions facilitated their execution, in large part based on the stated desire to facilitate the collection of information to bring the long-running litigation to an amicable close.  As such, the parties have since 2018 engaged in fairly extensive discovery and conducted depositions in several different states and locations."

identified specific directorates of the MDA that the DoD could not acknowledge had been searched, including one in particular which the plaintiff argued could contain responsive information. The court reserved judgment on the government's motion so it could address the plaintiff's concerns. (D. 238).

On October 30, 2020, the plaintiff cross-moved for summary judgment. (D. 255). On November 20, 2020, the government opposed the plaintiff's motion. (D. 260).[2]

## IV. DISCUSSION

In arguing its entitlement to summary judgment, the government relies on the assertions contained in a declaration from David Bagnati, MDA's Chief of Staff (D. 49-2), and seven declarations from Mark Herrington, MDA's Associate General Counsel. (D. 28-1; 49-1; 62; 69-1; 88; 120-1; 209-1; 260-4).

### A. MDA

With respect to the MDA, the First Circuit previously found that the declarations submitted up to that point had not claimed that all MDA filing systems were searched, or "explain[ed] why C4I or other Directorates' individual record systems were not reasonably likely to contain responsive records," or "contain[ed] the 'necessary' statement that the entire universe of files likely to contain responsive material was searched."

---

[2] The court subsequently determined to treat the government's motion for summary judgment and its opposition as a single pleading and has designated its more recent opposition as its motion for summary judgment. (D. 273).

On remand, Herrington explained in his fifth declaration that the MDA had not limited its search to the Test Directorate and, to demonstrate that the DoD had searched the records of every MDA directorate, including C4I, noted by reference to Bagnati's statement that searches had been made of the "MDA Unclassified Network (UNET) portal containing information from all MDA Directorates, the MDA Classified Network (CNET) portal containing information from all MDA Directorates, the NARA and DoD compliant MDA records repository application referred to as ECaRT for legacy documents to which all MDA Directorates contribute." (D. 88, ¶ 5). Herrington also "affirmatively state[d] that the entire universe of files within MDA likely to contain responsive material was searched." (D. 88, ¶ 6).

The court found this declaration to be inadequate in three principal ways. First, it was still insufficient to allow a conclusion that records systems in other individual directorates were either too burdensome to search or unlikely to contain responsive information, particularly where the government did not state that no such records systems exist. (D. 110 at 6-7). Although Herrington's fifth declaration set forth the details of the search the agency performed, and stated that all files likely to contain responsive materials were searched, the DoD conceded that its declarations never explicitly stated that "every file system in all MDA Directorates was searched." (D. 104, n. 2).

Second, the court found that the DoD also failed to provide a general description of the structure of its recordkeeping system sufficient to permit the court to assess its claim that further searches would be overly burdensome.  (D. 110 at 7).  In this regard, Herrington described two network portals and one records repository that were searched, but the court found the description regarding the extent of the search to be insufficient.

Third, the court found that the DoD failed to explain which, if any, of the agency-wide records systems would be likely to return all responsive documents from every MDA Directorate, and further did not explain the relationship between those systems and individual Directorates' records systems, if they exist.  (Id.) As such, the court found Herrington's assertion that the DoD had searched all MDA Directorates to be conclusory and unreliable.

<u>The Government's Argument</u>

The government argues that it has adequately addressed the court's stated concerns and demonstrated its fulfillment of its FOIA obligations.

     *i.   Scope of MDA's search*

First, Herrington has provided more details regarding the scope of the MDA's search.  The seventh declaration explains that the Missile Defense Data Center ("MDDC"), which falls within the Test Directorate, is the single authoritative location for all missile test records and it therefore is not reasonable to expect

responsive records would be located in any other location within the MDA.  (D. 260-4, "Seventh Declaration of Mark H. Herrington," ¶ 7).  Prior to the government's filing of its motion for summary judgment in June 2020, the DoD searched the MDDC's unclassified and classified portals maintained solely by the MDA Test Directorate.  (D. 209-1, "Sixth Declaration of Mark H. Herrington," ¶ 5).  The DoD also searched the electronic records of the MDA's predecessor, the Ballistic Missile Defense Organization ("BMDO"), which are maintained in the MDA Test Directorate.  (Id.).

Subsequently, the DoD conducted an additional search following the September 2020 summary judgment hearing.  This search took place because Stalcup, in his opposition, and at the hearing, identified specific organizations within the MDA that he believed had been overlooked in prior searches.  (D. 218, 219).  Stalcup produced a chart that referred to five particular MDA program organizations, including Advanced Technology, Sensors Command & Control, Ground-Based Weapon Systems, Sea-Based Weapon Systems, and Targets & Counter Measures.  (D. 219-8).  Of these, Stalcup contended that an office concerning the Aegis BMD Weapon System existed within the Sea-Based Weapon Systems directorate and might contain test records.[3]

---

[3] In his opposition filed ahead of the hearing, Stalcup challenged Herrington's assertion that searching outside the Test Directorate was not reasonably likely to locate responsive records.  Stalcup contended that some offices involved in east coast testing had "been realigned under the MDA's

According to the seventh declaration, Herrington, following the hearing, asked the MDA whether the Aegis BMD Weapon System was a component within the MDA, whether they were likely to have responsive records, whether the prior searches would have located those records, and whether a more thorough search should be conducted.  It does not appear that Herrington obtained answers to his questions.  Rather, Herrington states that he simply determined after further discussions with the MDA "to conduct a new search ensuring consideration be given to [Stalcup's] inquiries."  (D 260-4, ¶ 5).  In conducting the search, the MDA used the criteria used in 2010, which included the following search terms: "1996 Missile Defense Test and Evaluation Master Plans," "Live Fire Test and Evaluation Information," and "Joint Lessons Learned Report." Herrington explains that the search was on both the classified and the unclassified MDDC systems, and that no responsive records were found.  (D. 260-4, ¶ 5).

In addition, Herrington explains that the DoD searched the two systems where MDA missile test data is not normally found, but where administrative records such as policies and procedural records are stored, namely the MDA Portals (classified and unclassified) and the MDA electronic records application (known as

---

Sea Based Weapon Systems directorate, such as the Navy's 'Aegis BMD Weapon System.'"  He argued that "Aegis BMD ("Ballistic Missile Defense") was precisely what was being developed and tested off the East Coast in 1996," and that "[p]ermanent records from those tests are likely archived in that MDA area, which Defendant has not searched."  (D. 218, p. 13).

ECaRT) (classified and unclassified). No records were found on either of the MDA Portals but the MDA located within the MDA ECaRT the same four records that had been provided to Stalcup prior to the commencement of this litigation. (D. 260-4, ¶ 6).

Finally, Herrington explains that test-related records from other directorates that provided matrixed support to the five program organizations listed in the chart Stalcup provided would also be provided to the MDDC within the Test Directorate. (D. 260-4, ¶ 7).

The sixth declaration also describes the MDA record systems that were not searched and explains why they were not searched, namely because they do not concern the testing of missiles or were not in existence in 1996-1997, the timeframe relevant to Stalcup's request, and are solely used to automate the agency's daily activities. These include record systems relating to a video teleconferencing cyber management system, a DoD-level employee appraisal system, a program budget tool, a DoD timekeeping and financial management system, a DoD personnel system, an agency emergency alerting system, an electronic tasking system, an IT service desk incident management system, a DoD contract management system, and an agency personnel management system. (D. 209-1, ¶ 6).

Based on the foregoing, the sixth declaration asserts that, although the MDA did not search every agency record system, all

documents from the time frame relevant to the plaintiff's request are within the Test Directorate, and were searched, and searching outside of that directorate, therefore, is not likely to locate responsive documents. As such, according to the declaration, those systems that were searched contain all potentially responsive information from every component of the MDA. (D. 209-1, ¶ 6).

  *ii.  Description of recordkeeping system*

  With respect to the court's concern that the agency had thus far provided an insufficient description of the structure of the agency's recordkeeping system to allow the court to assess whether further searches would be unfruitful or overly burdensome, Herrington's sixth declaration states that the MDA Unclassified Network ("UNET") portal and the MDA Classified Network ("CNET") portal contain information from all the MDA Directorates, which were searched. (D. 209-1, ¶¶ 4-5). The portals contain active records of administrative matters, such as policies, directives, and procedures. (D. 209-1, ¶ 5). It explains further that once these administrative matters have been completed, the final product is placed in the ECaRT legacy system, which also was searched. (Id.). The declaration explains further that none of the records in UNET, CNET or ECaRT concern testing and that all testing records are contained within the MDDC's unclassified and classified portals, which is maintained by the Test Directorate and which were searched. (Id.). It explains further that,

although the MDA did not exist in 1996, it maintains official records of missile defense tests conducted by its predecessor, the BMDO, and those records are maintained in electronic format within the Test Directorate and were searched.  (Id.).

The Plaintiff's Argument

Stalcup does not directly address whether the agency has adequately addressed the court's concerns.  Rather, he argues that the agency still has not searched any of the directorates he identified at the summary judgment hearing, and thus has not satisfied its duty to conduct a reasonable search.  Although Herrington avers in his seventh declaration that he asked the MDA to conduct a new search "ensuring consideration be given to [Stalcup's] inquiries," Stalcup notes that Herrington never specifically asked the MDA to "search any overlooked area." Stalcup contends that the DoD in fact "refused" to search any of the areas and instead merely repeated the same search of the Test Directorate it had conducted years before, a search which located no responsive documents.  Stalcup also argues that it is "reasonably likely" that an organization might maintain their own archives "which may or may not include all the other components' test records."  He argues that the seventh declaration suggests that the archives of the groups that support these program organizations may have been searched, but that the program organizations themselves were not.  (D. 264-1).

<u>Discussion</u>

Although Herrington's sixth and seventh declarations could in some places benefit from greater clarity and/or simplification, the court finds that the declarations adequately address the concerns the court previously identified.  The court disagrees with the plaintiff that the agency has still failed to conduct a reasonable search.

To begin, although the DoD has not asserted that every file system within the MDA was searched, and indeed has not searched every file system within the MDA, the sixth and seventh affidavits allow one to conclude that (1) the agency has searched the areas where responsive documents are likely to be found, and (2) record systems in other directorates are unlikely to contain responsive information.

In that regard, the sixth declaration explains that the MDDC falls within the Test Directorate and is the single authoritative location for all missile test records.  It explains further that the agency previously searched the MDDC's unclassified and classified portals as well as the electronic records of the MDA's predecessor, the BMDO, which are maintained in the MDA Test Directorate.  The seventh declaration explains further that the DoD, based on assertions made by Stalcup, subsequently conducted a search of records in the office concerning the Aegis BMD Weapon System, within the Sea-Based Weapon Systems directorate, and

provided the search terms that were used for that search.  Further, the seventh declaration explains that the DoD searched the two systems where MDA missile test data is not normally found, the MDA Portals and the ECaRT, both classified and unclassified, and found no records except for four records within the MDA ECaRT that had been provided to Stalcup prior to the commencement of this litigation.  (D. 260-4, ¶ 6).

As importantly, the sixth declaration also specifies the several MDA record systems that the agency did not search, explains that these were systems that do not concern missile testing or were not in existence in 1996-1997, and lists for each its particular function.  ((D. 209-1, ¶ 6).

Further, the sixth declaration now provides a more fulsome description of the structure of the agency's recordkeeping system to allow one to conclude that further searches outside of the MDDC would be overly burdensome.  As noted above, it explains what information is contained in the unclassified and classified portals and where resolved matters are stored.  More notably, it also declares that none of the records in UNET, CNET or ECaRT, which were searched, concern testing, and that all the testing records are contained within the MDDC's portals maintained by the Test Directorate, which also were searched.

To this court, the additional declarations satisfy the agency's obligations because the agency has now provided a

reasonably detailed statement (through the cumulative declarations) that (1) sets forth the terms and type of search the agency performed, (2) avers that all files likely to contain responsive materials were searched, and (3) provides a general description of the structure of the agency's file system demonstrating why further search would be overly burdensome. *See Maynard*, 986 F.2d at 563.

To be sure, Stalcup argues that Herrington's seventh declaration reveals that the agency has still failed to search any of the directorates he identified at the summary judgment hearing, including in particular the Aegis BMD Weapon System. On this point, however, the court simply disagrees with Stalcup's assertion.

Undoubtedly, Herrington's seventh declaration could have been drafted more clearly. To Stalcup's point, Herrington states that he asked the MDA several questions to understand whether the Aegis BMD Weapon System was a component within the MDA, whether it had previously been searched, and whether a more thorough search should now be conducted, but he fails to say whether or how the MDA responded. Still, Herrington avers that he nonetheless "asked MDA to conduct a new search ensuring consideration be given to [Stalcup's] inquiries regarding the Aegis Weapons system," and then states affirmatively that the "MDA conducted an additional search for any relevant files related to" Stalcup's requests,

adding further that the search was conducted within the MDDC and included all missile test records, including the Aegis test records.  As such, the record does not show that the agency "refused" to search any of the program areas.  Crediting Herrington's seventh declaration, the court finds that the agency did conduct a search of the Aegis test records identified by Stalcup.

That being said, Stalcup appears to be correct to the extent he contends that the agency may not have searched the other four program areas he identified at the summary judgment hearing. Again, Herrington's affidavit could have provided greater clarity on this issue but the court does not find the ambiguity material. Even assuming no search of the other four areas was conducted, Stalcup advanced no arguments regarding the potential likelihood of responsive documents in these areas, focusing consistently on the potential responsiveness of records within the Aegis BMD Weapon System program, which was searched.  Further, he understood that the DoD might deem some areas not to be relevant and therefore decline to search them.  (D. 264-1).

Finally, Stalcup suggests there may be "component-specific archives" of various MDA directorates that have not been searched, but this assertion amounts to little more than conjecture and is not supported by firm evidence.  He also contends that the MDA should be deemed to control test records generated and maintained

by the Navy, Lockheed Martin, and Raytheon, but the government "has no legal obligation to produce records not within its possession." *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 138 (1980) (concluding that possession or control is a prerequisite to FOIA disclosure).

Based on the foregoing, the court finds that the government has met its burden of proving it has made a good faith effort to conduct a reasonably calculated search, and is entitled to summary judgment with respect to the MDA portion of the FOIA requests. The DoD did not search every system within the MDA, but an agency is not required to search every record system, only to perform a good faith, reasonable search of record systems likely to possess the requested information. *See Stalcup*, 768 F.3d at 74; *see also Oglesby*, 920 F.2d at 68 ("There is no requirement that an agency search every record system."). Even though the DoD has not located the kind of documents that Stalcup believes to exist, that does not render the government's search for documents inadequate or unreasonable. *See Whitfield v. Dep't of Treasury*, 255 F. App'x 533, 534 (D.C. Cir. 2007) (per curiam) ("[T]he agency's failure to turn up specific documents does not undermine the determination that the agency conducted an adequate search for the requested records."); *Elliott v. Nat'l Archives Records Admin.*, No. 06-CV-1246 JDB, 2006 WL 3783409, at *3 (D. D.C. Dec. 21, 2006)("An agency's search is not presumed unreasonable because it fails to

find all the requested information."). Nor does the government's failure to uncover the documents anticipated by the plaintiff indicate that its search was conducted in bad faith. *Twist v. Gonzales*, 171 F. App'x 855, 855 (D.C. Cir. 2005).

B.    OSD

Previously, Stalcup claimed that the OSD had failed to conduct a sufficient search for records about developmental missile testing, searching only the Office of the Director, Operational Test & Evaluation ("DOT&E") and the Office of the Deputy Assistant Secretary of Defense for Developmental Test & Evaluation ("DT&E"), two components within OSD, rather than the entire office. The First Circuit held that, although the DoD had stated that no other OSD components were likely to have responsive records, the agency also stated that even DOT&E and DT&E, the two components that *were* searched, were unlikely to have developmental missile testing records. The DoD searched the former because it was likely to have only operational (rather than developmental) missile testing records and searched the latter at Stalcup's request. (D. 79). In the absence of an explicit assertion that "developmental testing records dating back to 1996 no longer exist, or that a search for such records would be overly burdensome," the First Circuit found that the DoD's assertions did not meet its burden of showing that it executed a search "reasonably calculated to discover responsive developmental testing records." (Id.).

On remand, Herrington submitted his fifth declaration in part to address the First Circuit's concerns.  The court found that it was still insufficient to the extent it failed to claim that neither the OSD nor the JS has archives that would contain responsive documents from 1996.  Although Herrington stated that "[t]here are no archives or repository for older records, like those maintained by MDA, in DOT&E or DT&E," he did not claim that the agencies have no archives at all, whether similar or dissimilar to those maintained by the MDA, that would be reasonably likely to contain responsive documents.  (D. 110).  As such, the court found that the fifth declaration was insufficient to demonstrate that the agency's search was reasonably calculated to locate responsive records.  The court also found that the declaration failed to provide a description of the agency's file system demonstrating why a further search would be overly burdensome.  (Id.).

The Government's Argument

In response to the court's concern about whether the archives contain responsive documents from 1996, the sixth declaration states that with the exception of a small number of documents that had previously been located and provided to the plaintiff, no responsive documents are within them.  Herrington explains that the DOT&E conducted a search and reviewed its FY96 and FY97 Annual Reports for any missile tests or exercises from June 1, 1996 to October 30, 1996, on or off the east coast, but found no evidence

of such missile tests.  (D. 209-1, ¶ 14).  He explains further that a search of OSD records at the Washington National Records Center ("WNRC"), the official off-site repository for OSD records, turned up seven boxes of hard-copy documents that were potentially responsive to plaintiff's requests.  (D. 209-1, ¶ 21).  Responsive documents from those boxes were previously produced to the plaintiff in February 2019.  (D. 260-4, ¶¶ 12-13).

In his seventh declaration, Herrington provides more details. He explains the searches that the OSD Records, Privacy, Declassification Division ("RPDD") conducted in response to the plaintiff's FOIA request.  The RPDD searched the executive archive within the 2000 series of DoD Instruction 5015.02 "DoD Records Management Program," which contains files on operational test and evaluation and live fire test and evaluation.  The RPDD used the following terms:  "Ballistic Missile Defense Agency," "Ballistic Missile Defense Office," "Ballistic Missile Defense Organization," "BMDO," "MDA," and "Developmental Test and Evaluation."  (D. 260-4, ¶ 11).

The search yielded 37 hits or "accessions" totaling 479 boxes of already scanned electronic text searchable records, and three accessions totaling seven boxes that were in hard copy.  The RPDD obtained the hard copy records and scanned them into the executive archive.  As such, all 486 boxes of records were scanned into the executive archive.  The RPPD then searched the records using the

terms:  "Test and Evaluation Master Plan," "TEMP," "Live Fire Test AND Missile," "Live-Fire Test AND Missile," "Live Fire AND Missile," "Live-Fire AND Missile," "Joint Universal Lessons Learned," "JULL," and "(Down OR Crash) AND (Aircraft OR Airplane OR Airline)."  (D. 260-4, ¶ 12).

The search located 11 documents related to Test and Evaluation Master Plans totaling 20 pages, which previously were provided to the plaintiff.  Herrington notes, though, that the actual test plans were not contained in the hard copy records, that is, the seven boxes of documents.  He asked the agency why they were not located but was told only that "the actual plans were not contained in the hard copy records."  (D. 260-4, ¶ 13).

In addition, and in response to Stalcup's assertion that OSD may have responsive documents in other portions of the records kept at the WNRC, the government searched the areas he suggested. This included conducting a search under the 1300 Series, the DoD records management program instruction relating to the research, development, and technology prototyping activities across DoD and reflecting the missions of the Office of the Under Secretary of Defense for Research and Engineering, the Defense Advanced Research Projects Agency, Director of Defense Research and Engineering, Defense Innovation Unit - Experimental, the Defense Science Board, Strategic Capabilities Office, and Test Resource Management Center.  (D. 260-4, ¶ 14).  It also included searching

records at the WNRC under the 1400 Series relating to analysis on resource allocation and cost estimation of DoD plans, programs and budgets, reflecting the mission of the office of the Director, Cost Assessment and Program Evaluation.  (D. 260-4, ¶ 15).

The RPDD did not locate any accessions within the 1400 Series that would have responsive material.  The RPDD did locate five accessions totaling 85 boxes within the 1300 Series with potentially responsive material and performed an electronic search of these records using the search terms "Master Plan AND Missile Defense," "Live Fire Test," "Live-Fire Test," "Intercept AND Missile AND East Coast," "Joint Universal Lessons Learned," "JULL," and "Commercial Aircraft."  After reviewing all records located, it determined that none of those records were responsive to Stalcup's FOIA requests.  (D. 260-4, ¶ 16).

Herrington asserts that "the searches of MDA, JS, DOT&E, DT&E, and the WNRC encompass the entire universe of files within OSD/JS likely to contain responsive material to Plaintiff's requests." (D. 260-4, ¶ 17).

<u>The Plaintiff's Argument</u>

The plaintiff does not address whether the sixth and seventh declarations adequately indicate whether the OSD or the JS has archives that would contain responsive documents from 1996. Rather, he takes issue with the 479 boxes of scanned documents and seven boxes of hard copy documents that were located when the RPDD

searched the executive archive within the 2000 series of DoD Instruction 5015.02. Stalcup points out that, while Herrington's seventh declaration says that the actual test plans were not contained in the seven boxes of hard copy records, he does not definitively say whether the plans are (or are not) among the 479 boxes of scanned records, or in in some other collection. (D. 264-1 at 5).

Discussion

Herrington's sixth and seventh declarations unquestionably provide more detailed information to allow one to understand the steps the agency took to satisfy this portion of Stalcup's FOIA requests. They among other things provide a detailed recitation of areas that were searched and include the search terms to allow one to assess the efficacy of those searches, and indeed purport to directly respond to the court's concern as to whether the archives contain responsive records from 1996. The court finds, however, that the declarations ultimately do not allow the court to conclude that the government has made a good faith effort to conduct a search reasonably calculated to locate responsive records.

Ironically, the court's concern arises from a statement that appears in Herrington's most recent seventh declaration. As it indicates, and as Stalcup notes, a search of a specific area -- the 2000 series of DoD Instruction 5015.02 -- located 20 pages in

hard copy relating to the Test and Evaluation Master Plans, but did not locate the actual test plans themselves.  It is unclear why the actual plans were not also located.  Herrington posed that question to the agency but the agency's response that the plans simply were not among the records amounts essentially to a non-responsive answer.  Given the self-evident relevance of the actual test plans to the plaintiff's requests, and the agency's implicit concession that such records most likely do exist and would be responsive to the plaintiff's request, the failure to say more about this issue calls into question the reliability of Herrington's broader assertion that the searches of the MDA, JS, DOT&E, DT&E, and the WNRC encompass the entire universe of files within OSD/JS likely to contain responsive material.

Herrington does not explain, for example, why the actual test plans would only be located in the 2000 series.  Assuming there are other numbered series, the declarations do not explain which series correlate to what functions within OSD, and why searching those other series would be overly burdensome or unlikely to locate responsive records.  Further, Herrington states that records kept at the WNRC, where the searches here were conducted, are in time provided to the National Archives ("NARA") but does not state whether records responsive to the plaintiff's request might have already been transferred there, or whether a search of those records also was conducted.

It may be that the agency has indeed conducted a good faith reasonable search to locate all responsive documents, and there may be a wholly logical reason why the actual test plans were not located.  It may be, for example, that the actual test plans were misplaced, misfiled, or even no longer exist.  But, without more specific information explaining where the actual test plans would have been kept before and after being archived, and a description of those areas (to the extent one has not yet been provided) and a declaration as to whether those areas were or were not searched, the court is unable to conclude that the agency has met its obligation to conduct a good faith search.  For this reason, the court finds that the government is not entitled to summary judgment with respect to this portion of the plaintiff's FOIA requests.

   C.   **Joint Staff**

Previously, the court found that the DoD's description in Herrington's Fifth Declaration regarding a search of the J-7 Directorate, which turned up no responsive documents, was insufficient because it did not cogently explain the agency's decision to search only one Directorate.  (D. 110).  Although the affidavit stated that the agency did eventually consider whether other Directorates might possess responsive records, and moreover briefly described each of the other directorates' missions and functions, it did not describe their records systems, or how specifically the DoD considered whether those systems might

contain documents responsive to Stalcup's records request. The court found that without such a description, it was "not self-evident that the other Directorates were not likely to have responsive records," even with the fifth declaration's summary description of those Directorates' missions and functions. (D. 110 at 10, quoting D. 79 at 9-10). The court also found that the declaration failed to adequately describe the agency's file system to explain whether or how searching other areas would have been overly burdensome. (Id. at 11; D. 79 at 10).

<u>The Government's Argument</u>

In his fifth declaration, Herrington describes JS's recordkeeping systems for directorates within the JS. He explains that the JS maintains the Joint Staff Action Processing ("JSAP") files, a tracking system that contains all documents associated with a project, task, or action processed by JS personnel, and completed project files are placed in a record repository within the JS. (D. 209-1, ¶ 8). He explains that records are kept in accordance with the Joint Staff and Combatant Command Records Management Manual: Volume II – Disposition Schedule ("CJCSM 5760.01A, Vol. II"), whereupon they are destroyed or transferred to NARA. Depending on the record, the disposition schedule is either 6 months, 3 years, 7-10 years, or preserved permanently in the case of records containing information determined to be sufficiently valuable for historical or other purposes. (Id.).

Herrington further explains that the JS did search more than the J-7 (Joint Force Development).  It searched their Joint Lessons Learned Information System.  (D. 209-1, ¶ 11).  It also searched their Records, Research & Content Branch, and specifically the Universal Content Management ("UCM") system, due to the age of the records sought, which is the legacy/archival Joint Staff action tracking system.  (D. 209-1, ¶ 9).  Records maintained within this archive are available to conduct historical research as a part of processing current business actions by the staff or for preparing official historical accounts of the actions of the JS.  (Id.). Herrington explains that an electronic searchable archive of these older JSAP actions is maintained within internal staff electronic servers for convenience, although the actual record copy of all actions is maintained as a paper file.  A search of this archive located 105 pages, which subsequently were provided to the plaintiff.  (Id.).

In addition to JSAP records, Herrington explains that the JS directorates have shared drives that are individual to each directorate and are virtual and maintained on servers.  (D. 209-1, ¶ 10).  There is also a SharePoint site, to which all JS directorates have access, but this site has only existed since around 2007 and does not contain older records.  (Id.). Additionally, JS employs the defense enterprise email system, but Herrington indicates that given the age of the records requested

and the nature of the information sought, emails were not searched. Similarly, although JS personnel have personal drives maintained virtually on servers, given the age of the records sought, current personnel would not have responsive records on their individual drives which did not exist twenty years ago.  (Id.).

Herrington also explains how the agency considered whether the systems described above might contain documents responsive to Stalcup's records request.  He explains that the JS has a team who processes FOIA requests and, based on their knowledge of the missions and roles of the various directorates within JS, conducts searches in any office likely to maintain responsive documents. (D. 209-1, ¶ 11).  Here, given the age of the records sought, the team determined that the historic files contained within the UCM should be searched.

In terms of those directorates that were not searched, Herrington explains that the active SharePoint cite, personal drives, and the shared drives of the individual directorates are not reasonably likely to contain records from the 1990s.  He explains further that the other JS directorates do not conduct or oversee live fire tests, and even the search of the active files within Deputy Directorate for Joint Training within the J-7 did not locate responsive records.  (Id.).

Discussion

The court finds based on the foregoing that the government has adequately addressed the court's concerns. Through Herrington's sixth declaration, he explains that the JS conducted a search actually beyond the J-7 Directorate, explains where within other JS directorates other responsive records could be located, explains the searches that were conducted in those areas and the results, and explains why other directorates or areas were unlikely to have responsive information. The declaration as a whole allows the court to conclude that the agency has made a good faith effort to search for the requested documents, *see Oleskey ex rel. Boumediene*, 658 F. Supp. 2d at 294, and has described the scope and method of its search and why further search in the JS system would be difficult, *see Maynard*, 986 F.2d at 559-60. Notably, the plaintiff does not challenge the adequacy of the agency's search as it relates to JS. Summary judgment should therefore enter in the government's favor with respect to this portion of the FOIA requests.

**V. RECOMMENDATION**

For the foregoing reasons, I recommend that the government's motion for summary judgment (D. 260) be ALLOWED in part and DENIED in part. Specifically, the motion should be allowed with respect to the MDA and JS portions of the plaintiff's FOIA requests and denied with respect to the OSD portion. For the same reasons,

the plaintiff's motion for summary judgment (D. 255) should be denied with respect to the MDA and JS portions of his FOIA requests and allowed with respect to the OSD portion.[4]

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.

DATED:  September 14, 2021

---

[4] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).